UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| NICK  LECLAIR, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:17-CV-57 |
| | § | |
| DEPARTMENT OF FAMILY | § | |
| PROTECTIVE SERVICES, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMEDATION

Plaintiffs Nick LeClair and Emily Whipple have sued Defendants Bernadette Molina, Michelle Abundez, Carmen Avalos, three unidentified police officers (Officer Does), and the City of Corpus Christi for violation of their constitutional rights pursuant to 42 U.S.C. § 1983.  Plaintiffs also allege that Defendants committed the state common-law torts of intentional infliction of emotional distress and abuse of process.  Pending is a motion for voluntary dismissal without prejudice by Plaintiff Emily Whipple (D.E. 28) and a motion to dismiss for lack of jurisdiction and failure to state a claim by Defendant Carmen Avalos (D.E. 30).   Plaintiffs responded to Avalos's motion to dismiss on September 1, 2017 and Avalos replied to the response on September 8, 2017 (D.E. 33, 35).   For the reasons discussed more fully below, it is recommended that Plaintiff Whipple's motion to voluntarily dismiss her lawsuit be denied.  It is further recommended that Defendant Avalos's motion to dismiss be granted.

## JURISDICTION AND VENUE

This court has jurisdiction pursuant to 28 U.S.C. § 1331.

# BACKGROUND

**A. Plaintiffs' Factual Allegations**

The following facts are taken from Plaintiffs' amended complaint (D.E. 29). Plaintiffs Nick LeClair and Emily Whipple are the parents of a child, I.L., who was born two months prematurely on September 26, 2015 (D.E. 29 at p. 7). Plaintiffs and I.L. moved to Corpus Christi in December 2016 so that Whipple could take a job at a local hospital. They lived in hotels while looking for an apartment (*Id.* at p. 8). While Whipple was training at the hospital, a person reported to the Texas Department of Family and Protective Services (DFPS) that Plaintiffs and I.L. were living in their car in the hospital parking lot (*Id.*).

On December 15, 2016, an investigator from DFPS went to the hospital but found no evidence of a family living in the parking lot (*Id.* at 8-9). The next day, shortly after LeClair dropped Whipple off at work, he was in the hospital parking garage when three police cars approached his vehicle and parked in such a way that LeClair could not leave (*Id.* at p. 9). Officer Doe 1 told LeClair that they were there to intervene on behalf of the child (*Id.*)

LeClair, holding his child and a video camera, met the Officer Does and Defendant Avalos in the middle of the garage. Molina read to LeClair allegations that I.L. was severely malnourished, wearing dirty clothes, had dirty fingernails, and was covered in flea bites. LeClair pointed out that I.L. was chubby, wearing clean clothes, had a clean diaper, and no bite marks. LeClair told Molina that I.L. was breast fed and

also ate baby food. Molina told LeClair that DFPS had received reports that Plaintiffs were homeless and LeClair told Molina that they slept at hotels (*Id.*)

Molina told LeClair that he had to turn over I.L. so that he could be seen by a doctor for a physical evaluation. Alternatively, she said LeClair could follow her to the emergency room for the child to be evaluated by a doctor there (*Id.* at pp. 9-10). LeClair protested that the claims were unfounded and Police Officer Doe 1 told him that it did not matter that the claims were unfounded (*Id.* at p. 10). LeClair offered to take the child to a doctor of his choosing, but all the Defendants told him that he had to first take the child to the doctor chosen by DFPS (*Id.*)

LeClair then said that he wanted to get his own doctor but would not go anywhere without his wife and began to put I.L. in the car seat so he could find his wife. Molina tried to grab the car seat and LeClair told her to "back off," and she did (*Id.* at pp. 10-11). The officers were blocking LeClair's car so he asked Molina to get Whipple but she refused. Police Officer Doe 2 offered to pick Whipple up and did so. The officer put Whipple in the back of his patrol car in front of her coworkers and supervisors to drive her back to the parking garage (*Id.* at p. 11).

Whipple joined the others and heard the allegations. When Whipple asked if Molina had a warrant or a court order to take the child, Molina conceded that she did not (*Id.*). Molina then called her supervisor and returned to the group to ask Whipple which unit she worked for in the hospital. Molina explained that if Whipple did not answer her telephone in the future, Molina would track her down at her job (*Id.* at pp. 11-12).

Whipple asked her not to do that because it would make Whipple look unprofessional and as if she were not taking care of her own child (*Id.*).

Police Officer Doe 1 gave Plaintiffs an "event number" and told them they could obtain a copy of the police report and the body camera footage of the incident. The four Defendants left the garage at that point (*Id.* at p 12). On January 4, 2017 LeClair went to the police station to obtain a copy of the report and video and was told that it was unavailable (*Id.*).

On December 30, 2016, Defendant Avalos called LeClair and asked for Whipple, who was asleep. Avalos told LeClair that she had contacted Whipple's employer about the child negligence report and indicated that a second case had been filed. Avalos apologized for Molina's behavior in the parking garage and assured LeClair that she was not trying to take I.L. away from them (*Id.* at pp. 12-13). Avalos asked to meet with Plaintiffs so that she could see the child and take a picture of him. She claimed that no one had seen the child recently (*Id.* at p. 13). Avalos said she needed to see the child within a week or she would contact Whipple's employer again (*Id.* at pp. 12-13). LeClair told Avalos that he wanted to talk to his attorney about the matter and Avalos told him that if she did not see the child that same day, she would call in an Amber Alert (*Id.* at p. 14).[1]

---

[1] The AMBER alert system is an early warning system to help find abducted children. Once law enforcement officials have determined that a child has been abducted and the abduction meets AMBER alert criteria, law enforcement notifies broadcasters and state transportation officials. AMBER alerts interrupt regular programming and are broadcast on radio, television, highway signs, and other electronic media. https://www.amberalert.gov/index.htm (last viewed November 29, 2017).

LeClair and Avalos both called Plaintiffs' attorney and the three of them discussed how to proceed. Avalos said she only needed to see the child and the attorney told her to file a "motion to participate" because her allegations had no merit. Avalos told the attorney that Plaintiffs were on food stamps (Id. at pp. 14-15).

Plaintiffs agreed to meet with Avalos so that she could see the child and they met her that evening in a public parking lot. LeClair recorded the meeting where Avalos remarked on how beautiful and healthy the child looked and told them that she would recommend closing the case (*Id.* at pp. 14-15). About five minutes after the meeting Avalos called Plaintiffs and asked for copies of I.L.'s medical records (*Id.* at p. 15).

**B. Petition Filed by DFPS**

On January 12, 2017 DFPS filed a Petition for Orders in Aid of Investigation of a Report of Child Abuse or Neglect in Nueces County Court (filed under seal herein at D.E. 32-1). An affidavit prepared by Defendant Molina was filed along with the petition (filed under seal herein at D.E. 32-2). In the affidavit, Molina stated that DFPS had received two reports that Plaintiffs were living in their car and at the beach with I.L. and that the child wore the same clothes every day, had dirty fingernails, and looked small for his age (D.E. 32-2 at pp. 2, 3). Molina described the meeting with Plaintiffs in the parking garage and the meeting Avalos had with Plaintiffs in the parking lot. Regarding the child she stated, "[I.L.] was observed to be dressed well and without any visible marks or bruises; however, he was bundled up due to the weather." (D.E. 32-2 at p. 4).

Molina reported talking to LeClair's maternal grandmother and step-grandfather, who both said they had not seen Plaintiffs in several months. I.L.'s grandmother

described LeClair as very smart but said he had used drugs while he was in college and had been shot during a drug deal. She said that LeClair believed he was targeted by the F.B.I. and had distanced himself from family members. The grandmother did not believe that Whipple was helping LeClair with his mental health issues. The grandmother believed LeClair would protect I.L. (D.E. 32-2 at pp. 4-5).

LeClair's stepfather stated that he believed LeClair suffered from undiagnosed schizophrenia. He exhibited erratic, paranoid behavior in college and had briefly been hospitalized. LeClair had left home two years previously and had not returned (D.E. 32-2 at p. 5).

LeClair's biological mother confirmed that LeClair had been placed in a mental health facility for a 72-hour period during college because of his erratic behavior. She believed he used drugs besides marijuana in college but did not believe he currently was using drugs. LeClair treated his younger sister well and his mother believed he would be protective of his son. The mother did not believe Whipple was helping LeClair get mental health care that he needed. LeClair had told his mother that Whipple was having secret meetings with the F.B.I and providing information to him (D.E. 32-2 at p. 5).

Molina stated that DFPS was first contacted about I.L. on September 27, 2015 when it was alleged he was born at thirty-three weeks and that his mother had received no prenatal care. There was a concern that LeClair had a diagnosis of schizophrenia and that the parents were living on the beach with two dogs in the car and that there was a lack of bonding between the parents and I.L. Grandparents were contacted at that time and denied any mental health diagnosis for either parent. The family cooperated with DFPS

and the case was given a disposition of "ruled out." (D.E. 32-2 at p. 6). Molina noted that neither LeClair nor Whipple had any criminal history in Texas (D.E. 32-2 at p. 6).

On January 17, 2017 LeClair took I.L. to a doctor at the Children's Center of Corpus Christi who examined him and found no issues. The doctor described I.L. as well-nourished, well-developed, playful, and smiling. His weight was normal and his skin showed no rashes or lesions (D.E. 29 at pp. 18-19). On January 25, 2017 the county court found that DFPS had probable cause to conduct an investigation and authorized DFPS to transport I.L. for a medical evaluation and obtain medical records for the child (Filed under seal herein at D.E. 32-3).

On January 30, 2017 the DFPS petition was served on Whipple at work, despite the fact that DFPS had Plaintiffs' home address. The document was opened, passed through several departments, emailed by hospital management, and scanned for electronic record-keeping (D.E. 29 at pp. 16-17). Whipple was contacted by the risk manager at the hospital who told her that the subpoena had been served and would be forwarded to hospital management in accordance with hospital protocol. The risk manager said she would email the subpoena to Whipple and did so after it had been scanned (D.E. 29 at p. 19).

LeClair contacted the attorney for DFPS and asked if he could submit the records from I.L.'s January 17, 2017 doctor visit rather than see another doctor. The attorney told LeClair to submit the records but also told him that the county court had already authorized DFPS to take the child for an examination. LeClair tried several times to contact Defendant Abundez, a supervisor at DFPS, but was unable to do so. He

contacted Defendant Avalos but she told him their connection was bad and terminated the call (D.E. 29 at pp. 21-22).

On January 31, 2017 LeClair submitted medical records from I.L.'s doctor visit along with medical records from his birth and some immunization records to DFPS. Plaintiffs also filed a motion to dismiss the county court petition, alleging inadequate service of process (D.E. 29 at pp. 22-23).

On April 12, 2017 Plaintiffs received a copy of "the Affidavit and Motion to Participate" (D.E. 29 at p. 26).[2] DFPS sought a psychological assessment, random drug testing, regular meetings with an assigned caseworker, a safety plan, access to Plaintiffs' home, participation in a family assessment, and additional medical evaluations for I.L. The following day, LeClair and Whipple submitted urine samples for drug testing and no drugs were detected (D.E. 29 at p. 26).

A hearing was held on May 5, 2017 in the county court. LeClair testified and put on evidence regarding I.L.'s health and condition. LeClair also testified that he had a videotape from December 30, 2016 when Avalos had stated that I.L. looked clean and healthy and appeared to be at a good weight. The hearing was recessed so that the court could review the video and also see I.L. in chambers. The following day Plaintiffs allowed a representative of DFPS to inspect their home. On May 8, 2017 LeClair took I.L. for another medical examination and he was at a good weight with no medical issues found (D.E. 29 at pp. 26-27).

_____

[2] Plaintiffs did not submit a copy of this document and it does not appear to be included in the file.

Another hearing was held in county court on May 18, 2017. DFPS reported that I.L. appeared healthy and that the Plaintiffs' home was appropriate for raising a child. The county court found that Plaintiffs had complied with the previous orders and that DFPS was not entitled to further orders. The petition was denied and the orders were dismissed (D.E. 29 at p. 27; D.E. 32-4, filed under seal).

Plaintiffs filed this action in federal court on February 9, 2017 and filed an amended complaint on July 3, 2017, asserting the following causes of action: (1) all Defendants violated Plaintiffs' Fourteenth Amendment right to familial association when they attempted to seize I.L. without a warrant; (2) Molina, Abundez, Avalos, and Officer Does 1 and 3 violated Plaintiffs' Fourteenth Amendment Right to Substantive Due Process; (3) all Defendants violated Plaintiffs' civil rights by intentional infliction of emotional distress; and (4) all Defendants violated Plaintiffs' civil rights by engaging in abuse of process.

In Defendant Avalos's motion to dismiss she argues that (1) this Court lacks jurisdiction under Fed. R. Civ. P. 12(b)(1) because Plaintiffs have not suffered an injury in fact and therefore lack standing; (2) Plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6); (3) Defendant Avalos is entitled to qualified and statutory immunity and (4) Plaintiffs' intentional tort claims are barred by sovereign immunity.

## APPLICABLE LAW

### A. Whipple's Voluntary Motion to Dismiss

On July 3, 2017 Plaintiff Whipple filed a motion to for voluntary dismissal, asking that she be dismissed from this lawsuit without prejudice, pursuant to Fed. R. Civ. P.

41(a).  She states that Plaintiff LeClair will continue with the case and asks that if an attorney is brought in to the case at a later date to represent the Plaintiffs, that she be allowed to rejoin the case at that time.

Rule 41(a)(1)(A)(i) provides that a plaintiff may dismiss an action without a court order by filing a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment.  "The notice of dismissal is self-effectuating and terminates the case in and of itself; no order or other action of the district court is required."  *In re Amerijet Intern., Inc.*, 785 F.3d 967, 973 (5th Cir. 2015).

None of the defendants served in this case has filed an answer or a motion for summary judgment.  Defendant Avalos filed a motion to dismiss on August 4, 2017 and Defendant City of Corpus Christi filed a motion to dismiss on September 5, 2017 (D.E. 30, 34).  However, the filing of a motion to dismiss by a defendant will not prevent the voluntary dismissal of a case without prejudice by a plaintiff.  "Defendants who desire to prevent plaintiffs from invoking their unfettered right to dismiss actions under rule 41(a)(1) may do so by taking the simple step of filing an answer."  *Carter v. United States*, 547 F.2d 258, 259 (5th Cir. 1977).

Nevertheless, although Whipple describes her motion as one to dismiss the lawsuit, the effect of granting her motion would be to allow her to withdraw as a plaintiff with the option of rejoining the lawsuit at a later time.  The lawsuit would not be dismissed because LeClair would continue as a plaintiff.

Federal Rule of Civil Procedure 19(a) discusses parties who must be joined in an action when feasible:

(1) A person who is subject to service of process and whose joinder will not deprive the court of subject matter jurisdiction must be joined as a party if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or

> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

>> (i) as a practical matter impair or impede the person's ability to protect the interest; or

>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

The Advisory Committee Notes point out that the rule stresses the desirability of joining those persons in whose absence the court would be obliged to grant partial or "hollow" rather than complete relief to the parties before the court. In addition, the rule protects the interest of the public in avoiding repeated lawsuits on the same essential subject matter.

If Whipple is allowed to withdraw without prejudice, it will create the type of situation cautioned against in Rule 19(a). Whipple will face the possibility of not being able to protect her interests in the lawsuit and the defendants will be subjected to the risk of incurring multiple or inconsistent obligations arising out of the facts that make up this lawsuit. Also, allowing Whipple to withdraw at this point creates the possibility of multiple lawsuits on the same subject matter. Accordingly, it is recommended that Whipple's motion to withdraw from this lawsuit without prejudice be denied.

**B. Motion to Dismiss**

      **1. 12(b)(1)**

In ruling on a Rule 12(b)(1) motion to dismiss, a court may look at "'(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Tsolmon v. United States*, 841 F.3d 378, 382 (5th Cir. 2016)(quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)). The motion should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief. *Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). A court may dismiss a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Id.* A motion to dismiss for lack of Article III standing is properly considered under Rule 12(b)(1). *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n. 2 (2011). When a motion to dismiss for lack of jurisdiction is filed along with other Rule 12 motions, the court should address the jurisdictional argument before addressing other grounds for dismissal. *Ramming*, 281 F.3d at 161.

The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. *Id.* Thus, Plaintiffs bear the burden of proof that jurisdiction does in fact exist. *Id.*

Defendant Avalos argues that this Court does not have jurisdiction because Plaintiffs have not suffered an injury that is concrete, particularized, and actual or imminent, rather than hypothetical, and thus lack standing. In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Supreme Court set out the three elements of the constitutional minimum of standing: (1) The Plaintiff must have suffered an injury in

fact which is concrete and particularized and actual or imminent rather than conjectural or hypothetical; (2) There must be a causal connection between the injury and the conduct complained of and not the result of independent action of some third party not before the court; and (3) It must be likely rather than merely speculative that the injury will be redressed by a favorable decision.  *Id.* at 560 (internal citations and quotations omitted).

The person asserting jurisdiction bears the burden of proof and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e. with the manner and degree of evidence required at the successive stages of the litigation."  *Id.* at 561.  At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice because when considering a motion to dismiss, a court presumes that general allegations embrace specific facts necessary to support a claim.  *Id.*  When a lawsuit challenges the legality of government action or inaction, the nature and facts that must be averred at the pleading stage in order to establish standing depend upon whether the plaintiff is himself an object of the action at issue or if he is asserting injury arising from the government's action as it affects someone else.  If a plaintiff alleges that he was the object of the government action, there is ordinarily little question that the action or inaction has caused him injury.  *Id.* at 561-562.

Plaintiffs in this case allege that Defendants took actions against them in their role as parents to I.L. that deprived them of various constitutional and common law rights. They seek money damages from the individual defendants for these violations.  Based on

their pleadings, they have made allegations sufficient to bring them within the jurisdiction of the federal court. Defendant Avalos's arguments regarding whether Plaintiff has alleged facts sufficient to state a claim for relief, or overcome her qualified immunity defense, are better addressed under Rule 12(b)(6).

### 2. Rule 12(b)(6)

A motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) tests the formal sufficiency of the statement of a claim for relief. It is not a procedure for resolving disputes about the facts or the merits of a case. In ruling on a motion to dismiss, the court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Hines v. Alldredge*, 783 F.3d 197, 200-201 (5th Cir. 2015).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to prove the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the assumption are true (even if doubtful in fact) . . . .

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-555 (2007)(internal citations and quotations omitted).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court held the following:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Twombly*], 550 U.S. at 570, 127 S.Ct. at 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556, 127 S.Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557, 127 S.Ct. 1955.

*Iqbal*, 556 U.S. at 678. Accordingly, in order to survive a motion to dismiss, a plaintiff's complaint must allege enough facts to show that a plausible claim for relief exists on the face of the pleading.

In determining whether to grant a motion to dismiss, the court must not go outside the pleadings and must accept all well-pleaded facts as true, looking at them in the light most favorable to the plaintiff. *Scanlan v. Texas A&M University*, 343 F.3d 533, 536 (5th Cir. 2003). The Fifth Circuit has recognized one limited exception to this rule. In *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-499 (5th Cir. 2000), the Fifth Circuit approved a district court's consideration of documents attached to a motion to dismiss where the plaintiff did not object to or appeal consideration of the documents and the documents were central to the plaintiff's claim. *Id. See also In re Katrina Canal Beaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007)("[B]ecause the defendants attached the contracts to their motion to dismiss, the contracts were referred to in the complaints, and the contracts are central to the plaintiffs' claims, we may consider the terms of the contracts in assessing the motions to dismiss."). Defendant Avalos attached documents to her motion to dismiss that Plaintiffs referred to in their complaint. Accordingly, they will be considered as part of the pending motions.

### 3. 42 U.S.C. § 1983 Cause of Action

To state a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a violation of the Constitution or of federal law and that the violation was committed by someone

acting under color of state law. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252-53 (5th Cir. 2005) (internal citations omitted). Here, there is no question that Avalos was acting under color of state law. Thus, the remaining question before the Court is whether Plaintiffs have alleged facts to show a plausible claim for relief for violations of the Fourth and Fourteenth Amendments to the Constitution.

Claims under §1983 may be brought against persons in their individual or official capacities, or against a governmental entity. *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009)(*citing Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997)). Personal-capacity suits seek to impose liability upon a government official as an individual while official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent. *Id.* (citing *Monell v. Dept. of Soc. Serv's of City of New York*, 436 U.S. 658, 690, n. 55 (1978)). In a personal-capacity suit, the individual defendant may assert personal immunity defenses such as qualified immunity.

### 4. Qualified Immunity

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002)(en banc). To

discharge this burden, a plaintiff must satisfy a two-prong test. *Atteberry,* 430 F.3d at 251-252. First he must claim that the defendant committed a constitutional violation under current law. *Id.* (citation omitted). Second, he must claim that defendant's actions were objectively unreasonable in light of the law that was clearly established at the time of the actions about which he complained. *Id.*

While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory. *Pearson*, 555 U.S. at 236 (receding from *Saucier v. Katz*, 533 U.S. 194 (2001)).

### (a) Fourteenth Amendment Familial Association Claim

The Constitution protects the right to family integrity and the Supreme Court has recognized it as a form of liberty guaranteed by the due process clause of the Fourteenth Amendment. *Morris v. Dearborne*, 181 F.3d 657, 666-667 (5th Cir. 1999)(citing *Stanley v. Illinois*, 405 U.S. 645 (1972)). Generally, families have the right to "'remain together without the coercive interference of the awesome power of the state.'" *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988)(quoting *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2nd Cir. 1977)). In addition, parents have a fundamental right to make decisions concerning the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000). However, the right to family integrity must be balanced against the state's interest in protecting the safety, health, and welfare of children. *Wooley v. City of Baton Rouge*, 211 F.3d 913, 924 (5th Cir. 2000)(citing *Prince v. Massachusetts*, 321 U.S. 158,

166 (1944)).  The Fifth Circuit has stated clearly that the government may not seize a child from his or her parents in the absence of a court order, parental consent, or exigent circumstances.  *Gates v. Texas Dept. of Protective and Regulatory Services*, 537 F.3d 404, 429 (5th Cir. 2008).

Plaintiffs have been found to state a claim sufficient to overcome the defense of qualified immunity where they have shown that a child was taken from the family in the absence of a warrant, court order, or probable cause.  In *Morris*, 181 F.3d at 671-672, the Fifth Circuit found that a teacher who fabricated allegations of child abuse that led to the child being placed in foster care for three years was not entitled to qualified immunity.  Similarly, in *Cruz v. Mississippi Dept. of Human Services*, 9 F.Supp. 3d 668 (2014), the court found that fact issues precluded summary judgment for defendants who removed a newborn from her mother and placed her in foster care for a year.  The mother was from Mexico and spoke an indigenous dialect, but never was provided an interpreter who spoke her language.  Her baby was removed from her care based on allegations of neglect even though the language difficulties made the factual bases of the allegations unclear.  *Id.* at 682.

In the instant case, it is clear that Plaintiffs cannot state a claim for violation of their right to family integrity because the child was never seized.  Nor did Plaintiffs ever lose the right to make decisions concerning the care, custody, and control of I.L.  Because the integrity of their family was never disrupted, Plaintiffs cannot state a claim for violation of their Fourteenth Amendment right to family integrity.  Accordingly, Avalos

is entitled to qualified immunity and Plaintiffs' family integrity cause of action should be dismissed.

### (b) Violation of Plaintiffs' Right to Substantive Due Process

Plaintiffs also assert that the "seizure" of their child was a violation of their right to substantive due process. The due process clause of the Fourteenth Amendment bars certain governmental actions regardless of the procedural safeguards used to implement them. *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1996)(citations omitted). "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). The due process clause was intended to prevent government officials from abusing their power or employing it as an instrument of oppression. *Lewis*, 523 U.S. at 846 (internal citations and quotations omitted). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.*

When discussing executive actions by government officials, courts look at whether an alleged abuse of power is such that it shocks the conscience, violates the decencies of civilized conduct, or interferes with rights implicit in the concept of ordered liberty. *Id.* at 846-847(internal citations omitted). In *Morris*, the Fifth Circuit found that a teacher's fabrication of evidence of sexual abuse against a student's father "shocked the contemporary conscience." *Morris*, 181 F.3d at 668. However, in *Martin v. Texas Dept. of Protective and Regulatory Services*, 405 F.Supp.2d 775, 788 (S.D. Tex. 2005), the court found that employees of the child protection agency did not engage in conduct that shocked the conscience when they temporarily removed a child from her parents' home

following reports that she showed signs of having been sexually abused. The workers followed agency and statutory procedures and the parents were afforded a hearing the following day and notice and an opportunity for a later more developed, adversarial hearing. *Id.*

None of the actions that Plaintiffs attribute to Avalos shock the conscience. After Avalos was assigned to investigate the allegations that I.L. was being neglected she called Plaintiffs and asked to meet Plaintiffs in a public place with I.L. so that she could see the child. She told Plaintiffs that because the child had been wrapped in blankets when he was seen before that no one had gotten a good look at him. Avalos threatened to call in an Amber Alert if Plaintiff did not allow Avalos to see him but never did so. In a conference call with Plaintiffs' attorney, Avalos reported that the Plaintiffs received food stamps, which Plaintiffs claim was a violation of their privacy. Plaintiffs voluntarily met with Avalos and she took a picture of I.L. and said he looked healthy. She also requested copies of I.L.'s medical records.

Avalos informed Plaintiffs via text message that a "motion to participate" had been filed and that Whipple would be subpoenaed at her workplace. Avalos eventually sent a subpoena and a copy of the allegations against Plaintiffs to Whipple's employer who thus learned about the allegations, which Plaintiffs also claim was a violation of their privacy. Plaintiffs also allege that Avalos left them five "threatening and harassing voicemails" on February 18, 2017 in which she told Plaintiffs that a court order had been issued authorizing DFPS to take I.L. into custody for an exam and asking them to take the child

to the DFPS office. Plaintiffs further allege that Avalos lied in an affidavit when she said that Plaintiffs had refused to cooperate and refused services.

Assuming these allegations are true, they did not violate Plaintiffs' substantive due process rights. Avalos was assigned to investigate a report of child neglect and did so. She sought voluntary compliance from Plaintiffs and they complied. She apparently had contact information for Plaintiffs and used it locate them and serve them with notice of a hearing. Following the hearing, an examination of the child by a pediatrician, and an inspection of Plaintiffs' home, the allegations of neglect were dismissed. Avalos's actions did not violate the decencies of civilized conduct or interfere with rights implicit in the concept of ordered liberty. Therefore, she is entitled to qualified immunity on these allegations and this cause of action should be dismissed.

### 5. Immunity Under the Texas Family Code

In addition to qualified immunity, Avalos is entitled to statutory immunity under § 261.106 of the Texas Family Code. The statute provides that a person acting in good faith who reports or assists in the investigation of a report of alleged child abuse or neglect, or who participates in a judicial proceeding arising from a report or investigation of alleged child abuse or neglect, is immune from civil liability that might otherwise be incurred or imposed. Avalos raised this defense in her motion to dismiss and Plaintiffs have not alleged facts showing that she did not act in good faith. Therefore, it is recommended that Avalos be found immune from liability based on this statute and that this cause of action be dismissed.

**6.  Intentional Infliction of Emotional Distress**

Plaintiffs assert that Avalos, along with the other defendants, intentionally caused them severe emotional distress.  "Intentional infliction of emotional distress" is a tort under Texas common law.  To state a claim, a plaintiff must allege that (1) the defendant acted intentionally or recklessly; (2) the defendant engaged in extreme and outrageous conduct; (3) the actions cause the plaintiff emotional distress; and (4) the emotional distress was severe.  *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993).

In this case, Plaintiffs' allegations of intentional infliction of emotional distress against Avalos are barred by governmental immunity, even though they sue her in her individual capacity.  Texas Civil Practice and Remedies Code § 101.106(f) provides the following:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only.  On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

"Thus, a defendant is entitled to dismissal under section 101.106(f) upon proof that the plaintiff's suit (1) was based on conduct within the scope of the defendant's employment with a governmental unit and (2) could have been brought against the governmental unit under the Tort Claims Act."  *Tipps v. McCraw*, 945 F.Supp.2d 761, 766 (W.D. Tex. 2013)(citing *Anderson v. Bessman*, 365 S.W.3d 119, 124 (Tex. App. Houston [1st Dist.] 2011, mand. denied).  The statute strongly favors dismissal of government employees.

*Waxahachie Independent School Dist. v. Johnson*, 181 S.W.3d 781, 785 (Tex. App. Waco 2005, pet. denied).

An employee acts within the scope of her authority if she is discharging the duties generally assigned to her. *Anderson*, 365 S.W.3d at 125; *Tipps*, 945 F.Supp.2d at 766. It is clear that Avalos was acting in the scope of her authority because all of the actions described by Plaintiffs were taken during Avalos's investigation of the claims that I.L was neglected. In addition, the claims could have been brought under the Tort Claims Act against DFPS. In *Franka v. Velasquez*, 332 S.W.3d 367, 369 (Tex. 2011), the Texas Supreme Court held that the phrase "could have been brought" in § 101.106(f) means that all common-law tort theories alleged against a governmental unit are assumed to be "under the Tort Claims Act" for purposes of §101.106(f). "[S]uit is brought under the Act when it is filed, not when waiver of immunity by the Act is established." *Id.* at 380.[3] Accordingly, Avalos is entitled to dismissal of the intentional infliction of emotional distress cause of action brought by Plaintiffs.

### 7. Abuse of Process

Plaintiffs also assert a cause of action for abuse of process, contending that Avalos and the other defendants misused governmental processes to illegally gain medical information and detain Plaintiffs without their consent, a court order, or warrant, and in

---

[3] Although the effect of Tex. Civ. Prac. & Rem. Code § 101.106 is to cut off an avenue of recovery for plaintiffs, that is the intended result of the statute. *Tipps*, 945 F.Supp. at 767 (citing *Franka*, 332 S.W.3d at 384). "By waiving governmental immunity for the governmental unit, the court reasoned that 'the Legislature correspondingly sought to discourage or prevent recovery against an employee.'" *Id.* (citing *Franka*, 332 S.W.3d at 384).

the absence of exigent circumstances. As part of these allegations, Plaintiffs claim that Avalos lied under oath and fabricated material facts.

First, as discussed in the section above, Avalos is entitled to dismissal of this cause of action under Tex. Civ. Prac. & Rem. Code § 101.106. Plaintiffs are alleging that Avalos committed an intentional tort based on conduct within the scope of the defendant's employment with a governmental unit and it could have been brought against the governmental unit under the Tort Claims Act.

Second, Plaintiffs have not alleged facts to support a claim that Avalos engaged in abuse of process. To state a claim for abuse of process, a plaintiff must allege that (1) a defendant made an illegal, improper, perverted use of the process; (2) the defendant had an ulterior motive or purpose in exercising the illegal, perverted, or improper use of process; and (3) damage resulted to the plaintiff from the irregularity. *Andrade v. Chojnacki*, 65 F.Supp.2d 431, 469 (W.D. Tex. 1999)(citing *Detenbeck v. Koester*, 886 S.W.2d 477, 480 (Tex. App.—Houston [1st Dist.] 1994, no writ)). Plaintiffs have not alleged facts to make a showing on any of the necessary elements. For these reasons, the allegation that Avalos engaged in abuse of process should be dismissed.

## <u>RECOMMENDATION</u>

Based on the foregoing, it is respectfully recommended that Plaintiff Whipple's motion to dismiss the lawsuit (D.E. 28) be construed as a motion to withdraw as a plaintiff from the lawsuit and DENIED. It is further recommended that Defendant

Avalos's motion to dismiss (D.E. 30) be GRANTED and all of Plaintiffs' claims against Defendant Avalos be dismissed for failure to state a claim.

Respectfully submitted this 11th day of December, 2017.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United* Servs. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).